This case is Raytheon Technologies v. General Electric, 2020, 1755. Please proceed. Thank you, Your Honor. I may please the Court, Lauren Degnan for Raytheon Technologies, also referred to as Pratt and the Brief. The Board's error here is a legal one. It disregarded the undisputed evidence of non-enablement because it applied the wrong test for enablement, which is that the prior art must teach to make and use the claimed invention. We should keep in mind that the claimed invention here is not power density in a vacuum, but a specific engine that has that power density. Ms. Degnan, do I understand correctly that claims 1 and 15 were disclaimed? And so what we're dealing with are 3 and 16. And 3 and 16 deal only at minor changes, the number of fan blades being less than 18 and the second turbine having two stages. And I don't see that these limitations are especially argued as distinguishing. So why isn't this case easy? Because the independent claims were disclaimed. Your Honor, the independent claims were disclaimed as a way to streamline the issues. I'm sure you've noticed the briefing on the issues is substantial on the enablement issue. And the disclaimer was simply too narrow. The arguments are focused. Claims 3 and 16 include all the limitations of the claims. And so we would not say this is a way to address the, by just focusing on the additional limitation of Claim 3 since it incorporates the power density limitations and the remainder of limitations that are in Claims 1 and 2. Whatever the reasons for the disclaimers, they're gone. They're in the unpatentable category, aren't they? Your Honor, we would say that, yes, they are disclaimed and they are gone. That doesn't mean, does not operate as any admission that those limitations are per se irrelevant in the dependent claims. And I will add that the dependent claims are not simply minor changes because the number of stages has a major impact on turbine volume, which is one of the attributes in the power density limitation. And power density is a ratio of sea level takeoff thrust to turbine section volume. Ms. Degnan, this is Judge Chen. As I understand it, in GE's petition, they relied on a reference called GLEEB in challenging Claim 1. But they, for whatever reason, did not rely on GLEEB in its challenge to Claims 3 and 16. Is that right? That is correct, Your Honor. Does GLEEB teach a geared turbofan engine that has a power density greater than or equal to 1.5 and less than or equal to 5.5? So, Your Honor, before the Board, we disputed that assertion. So our position is that GLEEB does not include that, does not teach that limitation. Where did you dispute that? It was in our preliminary patent owner's response, Your Honor. And if you give me a moment, I may be able to get the page for you. No, it doesn't matter. I just am trying to understand the order of things. They filed the petition. GE filed the petition. You filed the preliminary patent owner response. But then before the Patent Board decided whether to institute, you, in that intervening period, you filed your disclaimer. Is that right? Your Honor, the disclaimer was after institution. Okay. So the Patent Board, in fact, reached a conclusion that there was a reasonable likelihood that Claim 1 was unpatentable in light of GLEEB. That's right. Okay. And then, in response to that, you, quote-unquote, streamlined the proceeding by disclaiming most of the claims of this patent. That's correct, Your Honor. Okay. Can I just ask, when it comes to Claim 1, I see a lot of elements that would be generic to just about any geared turbofan engine, fan, compressor, combustor, compressor, turbine, speed change system. And it seems like the point of novelty is the power density limitation. Is that right? So, Your Honor, we would say that all the limitations, every aspect of the engine is both the thrust and the turbine volume. I understand all that. But at this point, I don't see anything about the other limitations that necessarily bring about the particular claimed power density property value that you have recited in the claim. So, just to take us back to the petition's ground, the petition's ground relied on NIF's advanced engine of Figure 13 for each of the limitations. The baseline engine claimed in Figure 14 does not have at least a speed change system. So, in terms of what is the ground and what are the elements, we have to stay focused on what it was, and that was the advanced engine. And in terms of power density, these attributes within the claim, such as the number of the ratio of fan blades to rotors, the number of stages in each of the turbines of the turbine section, they all relate to and impact the turbine volume. And so, for that reason, you can't look at power density in a vacuum. The claim and the claim, the elements together, help contribute to the power density. And for that reason, the board was required in the tariff enablement analysis to consider whether the engine of Figure 13 of NIF was enabled, because that is the engine on which GE and the board relied. Okay, I see you want to talk about something else, and that's fine. Why don't you go ahead to the heart of your argument? So, the first part of my argument is to make sure we're focused on the board, in our view, made an error with respect to trying to reduce the invention down to the point of novelty. And in an obvious theory, all the limitations matter, and they matter particularly with respect to power density, given how it is calculated. And so, then the board made a second error in disregarding the evidence that NIF's engine, advanced engine in Figure 13, was not enabled, by disregarding the evidence that the futuristic materials were relevant. It wasn't enabled because the advanced materials weren't available? That's exactly right, Your Honor. It was not available at the time of the 751 patent. And the specific performance characteristics that the board looked at in NIF could not have been achieved with the materials available at the time of the 751 patent. And, in fact, some of them, like the overall pressure ratio, the OPR, could not be achieved, the record showed, even as of 2019. But NIF is an obviousness reference, right? Yes. So, does NIF really have to be enabling with respect to what it teaches, with respect to the claimed invention, whether the claimed invention would have been obvious, based on what NIF discloses, even if NIF isn't enabling itself, if I've stated that accurately? Your Honor, this court's cases say that the portion of the reference on which one relies for obviousness does have to be enabled. So we are not saying that in all obviousness cases, single reference or otherwise, the entire reference needs to be enabled. We're saying it's important to look at the portion of that reference that's being relied on for the obviousness theory. Ashland Oil, we think, supports this very clearly. And because GE and the board... Sorry, Ms. Degnan, this is Judge Shen. Just to be specific about this, because I think this is really important to be precise, there's at least one example I can think of. I think it's called the Apple case, where what was being relied upon in a given prior art reference wasn't actually self-enabling, but it was some discussion that was a basis to provide a motivation to combine, to do some other kind of modification to a different prior art reference. But what was being relied on in that first reference itself was not self-enabling, I don't think. Is that a fair characterization? I think that in the Apple case you're referring to, Judge Shen, I think that that was in fact the issue. And I think it was remanded to see that when you made the combination, the prior art combined as a whole would have enabling disclosure for each of the limitations. Right. But I think the point is that we have to be careful when I heard you say that whatever we rely upon in a given prior art reference, that portion always has to be self-enabling. And I'm not sure that's correct. Because as you pointed out right before I cut you off, the question is the prior art as a whole has to enable a skilled artisan to make the claimed invention. And so you can take different pieces here and there. It's not such a rigid requirement that whatever little piece you take from an individual prior art reference, that prior art reference must self-enable that particular portion on which you're borrowing from that reference. Is that a fair statement? So, Your Honor, I think we agree with that as a fair statement. But that is why the grounded issue here is so important. Here, GE's ground and the board relies on these futuristic unavailable materials in order to do the analysis to say that the power density limitation is met. And because they are relying on that portion, that engine needs a figure 13. It needs the unavailable materials. That engine itself has to be enabled. If there's a different case where they were combining it with another piece of prior art that did, in fact, have enabling disclosure of all these materials to be able to achieve the weight requirements, the temperature operation, and the overall pressure ratio, if that secondary reference was enabled, we'd have a very different case than we have here. If the only thing they pointed to is that engine of figure 13 that is absolutely relying upon these unavailable materials, which is why we are not advancing a massive change in the law. We're asking this court to apply the law of Ashland Oil and those other cases that says you have to enable the portions on which you rely, and GE defined the scope of what it was relying upon. Ms. Tegnan, I haven't heard the warning sign, but I know you're well into your rebuttal time. So why don't we hear from Mr. Ferguson, and we'll save five minutes for you. Thank you, Your Honor. Thank you, Your Honor. May it please the court, Brian Ferguson for General Electric. The board's decision here should be affirmed. With respect to the point Judge Lurie made, the only claims at issue here are claims 3 and 16, and the record shows that Pratt never argued independently for the patentability of those claims as at Appendix 64 to 65. They made no argument before the board as to those claims. They've made no argument here before this court. With respect to the issue of enablement and the NIP reference, the board carefully weighed the evidence and found that NIP sufficiently enables the claims of the 751 patent, and that is the correct standard, and the board further found that the claims were obvious in view of NIP. Those factual findings regarding NIP and regarding obviousness are all supported by substantial evidence here. Mr. Ferguson, this is Judge Chen. The heart of the case comes down to whether a skilled artisan could make the claimed engine based on the information in NIP's disclosure, and what I saw the board doing was analyzing the question of whether there was sufficient information in NIP's disclosure in order to calculate a power density value that, based on the parameters disclosed in NIP, would meet the power density claim limitation in Claim 1. I did not see the board ever confront the question of whether a skilled artisan, based on whatever disclosures provided in NIP, could actually make the claimed invention, the claimed geared turbofan engine. What would be your best quote and page of the board opinion that would show me that, that I think was missing, and perhaps I overlooked it, but where would you point me to in the board's opinion? Certainly, Your Honor. There's two places where I would point you to that. The first would be pages 25 to 26 of the appendix, the board's decision, which has a reference to that NIP, that a person of skill in the art would be motivated, based on NIP, to, first of all, calculate the power density, and then they say... I'm sorry. Can you... I'm a little lost. Yes. If you could slow down and point me... Certainly. ...more where on... You're at page 25? So, on appendix page 26... Oh, 26. ...which is the board's opinion, at the very top, the board concludes, and this is after an 11-page analysis based on the evidence, taken in totality, the WANs factors support the conclusion that NIP is an enabling reference. Okay. So, that's the conclusion. I'm looking for the analysis of what is it about NIP's disclosure that convinced the person could make the claimed engine with the claimed power density? Sure. So, there's two things on that, Your Honor. Because the real concern I have is that NIP is discussing a futuristic aspirational engine that did not exist then, and could not exist then, because the so-called advanced materials did not exist at that time, and they still do not exist. And so, one could imagine that all that was being discussed and disclosed in NIP was something almost like a science fiction novel. Like, wow, wouldn't it be great if we had materials that were so light and resilient that we could make a much more efficient engine, fuel-efficient engine? Okay. That would be great, but those dreamlike materials don't exist. So, I'm concerned right now. What is it about NIP's disclosure beyond those dreamlike advanced materials could convince a fact finder that a skilled artisan would be able to rely on those hypothetical materials to make a claimed invention with these power density values? Yes, Your Honor. There's a lot to unpack there, but I would start with this. The NIP engine, the specific futuristic materials that you're describing and on which Pratt relies, are not required for purposes of building of whether a person of ordinary skill in the art looking at NIP would understand that the claimed invention in the 751 patent would be easily and readily achievable. And I'll start with, first of all, all of the structural elements of Claim 1 and Claim 3 were well-known standard components, and Pratt did not contest that below. The board found at page 27 of the opinion, UTC does not dispute that these claim elements are either known components of gas turbine engines or disclosed in NIP. Then, the board went on with respect to the main, as it was described, point of novelty. The main point is whether NIP would render obvious to a person of skill that a standard engine, having all the components, which Pratt did not dispute, would have a power density within the claimed range. And the board's analysis on that spanned upwards of 25 pages, beginning at page 27, looking carefully at the evidence, seeing that, first of all, the power density is simply a known byproduct of geared turbofan engines. The evidence was very clear that because you used a geared engine, you would end up with a smaller turbine section because you did not need as many stages in the turbine section to do the same amount of work. The evidence on that was overwhelming, and the board cited it, appendix 22 to 23, appendix 60 to 62. Pratt never contested that. Well, that's fine that using a geared turbofan engine as opposed to a non-geared turbofan engine will increase the overall engine efficiency on a conceptual, qualitative level. Fine. But now we're talking about something different, aren't we? We're talking about how do you get to these super high levels of power density that are recited in the claim. And the only thing I saw where the board tied anything in the prior art or anything within the knowledge of a skilled artisan to reach that level of a power density was purely based on whatever NIP's futuristic design would yield, assuming that we could ever build NIP's futuristic design. I would respectfully disagree, Your Honor. So where can we find that in the board decision? Okay. First of all, back to the issue of the power density. The board, again, the board found that power density is known in the art and was a results-effective variable. And that's a point that Pratt did not contest in its briefing, and that starts at page 54 of the board's analysis. With respect to the other evidence that was before the board, as we showed, GLEEB teaches a power density directly square in the middle of the range. I'm sorry. Mr. Ferguson, I just want to give you another chance, because my question that I asked before, to me, is absolutely pivotal to how I think about this case and how I ultimately choose to vote on this case. And as I understand it, it all comes down to whether a skilled artisan can make the claimed invention based on the evidence you put forth. And the evidence you put forth for purposes of challenging Claims 3 and 16 were NIP's disclosure. And, in fact, the board relied solely on NIP's disclosure, at least based on how I saw the board opinion. And so I'm asking you, what was it about NIP's disclosure that can show me that I can feel satisfied that it was reasonable to find that NIP's disclosure is good enough to enable a skilled artisan to make your claimed invention? Or, alternatively, to what extent did the board rely on anything else other than NIP's disclosure to support and supplement NIP's disclosure to reach the finding that a skilled artisan could make this claimed invention with a super high power density value? Got it, Your Honor. First of all, I don't think it's a super high power density, because, again, GLEEB was right in the middle of that. The GLEEB reference was… …to Claims 3 and 16, right? Correct. That's right, Your Honor. Okay. So let me say this, then, with respect to your question. What GE put forward below and what the board relied on was that when you look at – when persons of ordinary skill look at a reference like NIP, they use simulation software to design the engine and to test the engine. And that's what we relied on, which is called the gas-turb design software. Now, the reason you do this is because, as our expert testified, it's prohibitively expensive to try to build prototypes to cut metal, so to speak, in order to try to construct an engine that meets what's in the prior art. That's at Appendix 4977. Using gas-turb, our expert, Dr. Atiyah, was able to successfully construct a working model of the NIP engine that does not rely on these futuristic materials. That's not needed, because the claims here don't require any specific materials. What Dr. Atiyah showed is that a person of ordinary skill in the art would realize, by building what's constructed in Figure 13 of NIP, that you would get, with all of the materials that are disclosed in NIP – not the structural materials, but the operating parameters – you would get what he testified was is a well-behaved engine with thermodynamic properties that are well within expectations. That's at Appendix 781. And he specifically also said that – I'm sorry, what page is that? Appendix 781, which is Dr. Atiyah's analysis, and I'll provide more data on that. He testified that sufficient data was provided in NIP's paper to construct a model of his engine. He used the gas-turb software to do that. He showed that his inputs met NIP's stated performance goals, quote, nearly perfectly, and that the result was, quote, well consistent with expectations of high-bypass turbofan engines, and that the results showed a well-behaved engine with thermodynamic properties that are well within expectations. The board relied on Dr. Atiyah's findings that an engine, a person of oriented skill in the art, could construct an engine that would meet Claim 1, regardless of whether these alleged futuristic materials were needed or not. And where did the board say that, what you just said, and relied on 8781? That's what I've been looking for. Okay. And I would assume you're also – there was something probably in your petitioner reply that sided to and relied on 8781 for why there – Yeah. That a skilled artisan would be able to make the claimed engine based on NIP's disclosure? Absolutely, Your Honor. It's Appendix 781, which is – and it's – that's Dr. Atiyah's analysis. I got that. I'm talking about your petitioner reply and the board's decision. Okay. That was relying on this passage from Dr. Atiyah. So, for example, Your Honor, I'm looking at page 42 of the opinion – page 42, 43, and 44 of the board's opinion, and you'll see that the board is analyzing and the board is citing to Dr. Atiyah, that's exhibit 1003, which is what the board is citing to. That's the declaration. And then you'll see references to Appendix A, which is, for example, on page 43. Finish your thought, Mr. Ferguson. Yes. So, all of these cites in the board's opinion to Dr. Atiyah's declaration, and in particular the Appendix A paragraphs, like paragraphs 2 and 11, which are at page 43 of the opinion, that is the board relying on the factual findings from Dr. Atiyah, as I cited at Appendix 781, that NIP's engine could be simulated and successfully constructed. And, therefore, is enabled with respect to the claimed invention. Anything further? No. All right. Thank you, Mr. Ferguson. Ms. Degnan has five minutes for rebuttal. Thank you, Your Honor. I'm going to jump in and talk about these appendix cites that counsel just referenced. So, in Appendix 781, Dr. Atiyah talks about specific thrust values. They're roughly, you know, 28,000 and 30,000 pound force that he used in his model. And then, if you flip back to Appendix page 774, again, there's more data about his model. If you look at the four in a circle, that's the OPR, overall pressure ratio of 87. His model adopts the attributes in NIP that can be achieved only because NIP is using futuristic materials. I refer the court to Appendix 902-04 of NIP, where it specifically says that the OPR is able to be achieved due to the use of advanced composite materials and the temperature as well. The board, on the same page as counsel cited, 42-44, rejected the argument that Pratt made that Dr. Atiyah's thrust values were too low. It rejected that argument because it said, look, this futuristic engine of Figure 13 is lighter and more efficient. But those same pages, Appendix 902-04, NIP teaches us the only reason it can be lighter and more efficient is because of the materials that are used. Lighter materials and advanced materials. So the entire model and the board's analysis of the wants factors and of the thrust and the volume calculation are all based on NIP's teaching that these values can be achieved only by using these unavailable futuristic materials. Ms. Degnan, when Dr. Atiyah at A781 talked about how sufficient data is provided in NIP's paper to construct a model of his engine, when Dr. Atiyah said the word model, he's not talking about an actual physical model. He's talking about a computer software model. That's exactly right, Judge Chen. It is a computer model. And then in A42-44, the board's analysis that relies on Dr. Atiyah's testimony. The board's analysis when it relies on that. So it's a turbo fan with the power density value based on NIP's disclosure? Judge Chen, you are exactly right. That's exactly what the board has done. And your assessment of that is correct. With respect to counsel's position that the materials are not recited in the claim, it harkens back to this court's case law relating to really thought experiments. Thought experiments are not enabled prior art. And the cases that I think are most apropos are the chemical compound cases where this court has held many occasions that prior art references that disclose the compound by chemical formula are not enabled unless a known or obvious method of synthesizing the compound existed. That method of synthesizing the compound is not always in the claims. But the claims, nevertheless, the prior art is nevertheless not enabled despite the nature of those claims not requiring the synthesization. So those would be the main points I want to make, Your Honor. And then I'll close with the idea, just to bring this court back to the burden shifting. It was GE bore the burden to bring in evidence. There's no question GE did not dispute that Pratt brought in the evidence to show a robust presumption that NIP was enabled. It rested on its false and wrong impression that the law simply didn't require it to provide any evidence because the claims didn't recite materials and because enablement is not necessary to be proved with respect to obviousness. Let's say we agreed with you that there was a mistake by the board in how it analyzed the enablement question for the prior art. Would that require a remand because, in our view, the board did an incomplete, insufficient legal analysis? Or would it be a reversal? So, Your Honor, we think in this case it would be a reversal, given the one-sided nature of the evidence. And Owens Corning supports the idea that, you know, given that GE never disputed that the materials were unavailable at the time of the 715 patent, never put in any evidence, we think this would be a case where a remand would not be necessary and this court could reverse. Thank you, Ms. Degnan. We appreciate the arguments of both of you and the case will be submitted. The Honorable Court is adjourned until tomorrow morning at 10 a.m.